1 | **ROBERT R. HENSSLER JR.**
California State Bar No. 216165
2 | FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
3 | San Diego, California  92101-5008
Telephone:  (619) 234-8467

4

5 | Attorneys for Mr. Mojica-Peralta

6

7 | UNITED STATES DISTRICT COURT

8 | SOUTHERN DISTRICT OF CALIFORNIA

9 | **(HONORABLE BARRY T. MOSKOWITZ)**

10 | UNITED STATES OF AMERICA,                )        CASE NO.  07CR2984-BTM
                                                             )
11 |        Plaintiff,                                  )        DATE: DECEMBER 14, 2007
                                                             )        TIME: 1:30 P.M.
12 | v.                                                    )
                                                             )        MEMORANDUM OF POINTS AND
13 | FELIX MOJICA-PERALTA,                 )        AUTHORITIES IN SUPPORT OF
                                                             )        DEFENDANT'S MOTIONS
14 |        Defendant.                               )

15

16 | **I.**

17 | **STATEMENT OF FACTS**[1]

18 |        Agents of the United States Border Patrol arrested Mr. Mojica at approximately 8:00 a.m., on October

19 | 2, 2007, in the Campo area of California.  Mr. Mojica was initially questioned without being given Miranda

20 | warnings.  Subsequently, Mr. Mojica was advised he had a right to contact the Mexican consulate and

21 | apparently was questioned again without Miranda warnings.  Then, at approximately 3:23 p.m., Mr. Mojica

22 | was advised that his Administrative Rights would no longer apply because he was being charged criminally.

23 | Mr. Mojica was then advised of his Miranda rights and questioned for a third time.  Finally, at a "later time,"

24 | the Border Patrol Agent found Mr. Mojica to be amenable to a 8 U.S.C. § 1326 and again questioned him.

25 | //

26

27 | [1]  This statement of facts is based on the complaint and indictment filed by the government and the discovery
28 | provided by the government.  Mr. Mojica does not accept this statement as his own, and reserves the right to
take a contrary position at motion hearings and trial.  Additionally, Mr. Mojica  reserves the right to challenge
the truth and accuracy of these facts in any subsequent pleadings or during any further proceedings.

On October 4, 2007, Mr. Mojica was arraigned on an indictment alleging a violation of 8 U.S.C. §1326, specifically being found in the United States after deportation.

To date, counsel for Mr. Mojica has received only 44 pages of discovery and a DVD. Counsel has not yet had the opportunity to review Mr. Mojica's immigration file or received any recordings of his removal proceedings. These motions follow.

## II.

## MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE

Mr. Mojica moves for the production of the following discovery. This request is not limited to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody, control, care, or knowledge of any "closely connected investigative [or other] agencies." See United States v. Bryan, 868 F.2d 1032 (9th Cir.), cert. denied, 493 U.S. 858 (1989).

(1) The Defendant's Statements. The Government must disclose to the defendant all copies of any written or recorded statements made by the defendant; the substance of any statements made by the defendant which the Government intends to offer in evidence at trial; any response by the defendant to interrogation; the substance of any oral statements which the Government intends to introduce at trial and any written summaries of the defendant's oral statements contained in the handwritten notes of the Government agent; any response to any Miranda warnings which may have been given to the defendant; as well as any other statements by the defendant. Fed. R. Crim. P. 16(a)(1)(A). The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal all the defendant's statements, whether oral or written, regardless of whether the government intends to make any use of those statements.

(2) Arrest Reports, Notes and Dispatch Tapes. The defendant also specifically requests the Government to turn over all arrest reports, notes, dispatch or any other tapes, and TECS records that relate to the circumstances surrounding his arrest or any questioning. This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of the defendant or any other discoverable material is contained. Such material is discoverable under Fed. R. Crim. P. 16(a)(1)(A) and Brady v. Maryland, 373 U.S. 83 (1963). The Government must produce arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to the defendant. See Fed. R. Crim. P. 16(a)(1)(B) and (C), Fed. R. Crim. P. 26.2 and 12(I).

07CR2984-BTM

(3) <u>Brady Material</u>.  The defendant requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the Government's case.  Under <u>Brady</u>, impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused.  <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976).

(4) <u>Any Information That May Result in a Lower Sentence Under The Guidelines</u>.  The Government must produce this information under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  This request includes any cooperation or attempted cooperation by the defendant as well as any information that could affect any base offense level or specific offense characteristic under Chapter Two of the Guidelines.  The defendant also requests any information relevant to a Chapter Three adjustment, a determination of the defendant's criminal history, and information relevant to any other application of the Guidelines.

(5) <u>The Defendant's Prior Record</u>.  The defendant requests disclosure of his prior record. Fed. R. Crim. P. 16(a)(1)(B).

(6) <u>Any Proposed 404(b) Evidence</u>.  The government must produce evidence of prior similar acts under Fed. R. Crim. P. 16(a)(1)(C) and Fed. R. Evid. 404(b) and 609.  In addition, under Rule 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(B) at trial. The defendant requests that such notice be given three (3) weeks before trial in order to give the defense time to adequately investigate and prepare for trial.

(7) <u>Evidence Seized</u>.  The defendant requests production of evidence seized as a result of any search, either warrantless or with a warrant.  Fed. R. Crim. P. 16(a)(1)(C).

(8) <u>Request for Preservation of Evidence</u>.  The defendant specifically requests the preservation of all dispatch tapes or any other physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the Government and which relate to the arrest or the events leading to the arrest in this case.

(9) <u>Tangible Objects</u>.  The defendant requests the opportunity to inspect and copy as well as test, if necessary, all other documents and tangible objects, including photographs, books, papers, documents, fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense or intended for

07CR2984-BTM

1  use in the Government's case-in-chief or were obtained from or belong to the defendant.  Fed. R. Crim. P.

2  16(a)(2)(c).  **Specifically, the defendant requests to view the A-File.**

3      (10)  <u>Evidence of Bias or Motive to Lie</u>.  The defendant requests any evidence that any prospective

4  Government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his or

5  her testimony.

6      (11)  <u>Impeachment Evidence</u>.  The defendant requests any evidence that any prospective Government

7  witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness has

8  made a statement favorable to the defendant.  <u>See</u> Fed R. Evid. 608, 609 and 613; <u>Brady v. Maryland</u>, <u>supra</u>.

9      (12)  <u>Evidence of Criminal Investigation of Any Government Witness</u>.  The defendant requests any

10 evidence that any prospective witness is under investigation by federal, state or local authorities for any

11 criminal conduct.

12     (13)  <u>Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling</u>.  The

13 defense requests any evidence, including any medical or psychiatric report or evaluation, that tends to show

14 that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired, and

15 any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an

16 alcoholic.

17     (14)  <u>Witness Addresses</u>.  The defendant requests the name and last known address of each prospective

18 Government witness.  The defendant also requests the name and last known address of every witness to the

19 crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will <u>not</u> be called as

20 a Government witness.

21     (15)  <u>Name of Witnesses Favorable to the Defendant</u>.  The defendant requests the name of any witness

22 who made an arguably favorable statement concerning the defendant or who could not identify him or who

23 was unsure of his identity, or participation in the crime charged.

24     (16)  <u>Statements Relevant to the Defense</u>.  The defendant requests disclosure of any statement relevant

25 to any possible defense or contention that he might assert.

26     (17)  <u>Jencks Act Material</u>.  The defendant requests production in advance of trial of all material,

27 including dispatch tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500.

28 Advance production will avoid the possibility of delay at the request of defendant to investigate the Jencks

1   material.  A verbal acknowledgment that "rough" notes constitute an accurate account of the witness'

2   interview is sufficient for the report or notes to qualify as a statement under § 3500(e)(1).  <u>Campbell v. United</u>

3   <u>States</u>, 373 U.S. 487, 490-92 (1963).  In <u>United States v. Boshell</u>, 952 F.2d 1101 (9th Cir. 1991) the Ninth

4   Circuit held that when an agent goes over interview notes with the subject of the interview the notes are then

5   subject to the Jencks Act.

6      (18)  <u>Giglio Information</u>.  Pursuant to <u>Giglio v. United States</u>, 405 U.S. 150 (1972), the defendant

7   requests all statements and/or promises, express or implied, made to any Government witnesses, in exchange

8   for their testimony in this case, and all other information which could arguably be used for the impeachment

9   of any Government witnesses.

10     (19)  <u>Agreements Between the Government and Witnesses</u>.  The defendant requests discovery

11  regarding any express or implicit promise, understanding, offer of immunity, of past, present, or future

12  compensation, or any other kind of agreement or understanding, including any implicit understanding relating

13  to criminal or civil income tax, forfeiture or fine liability,  between any prospective Government witness and

14  the Government (federal, state and/or local).  This request also includes any discussion with a potential

15  witness about or advice concerning any contemplated prosecution, or any possible plea bargain, even if no

16  bargain was made, or the advice not followed.

17     (20)  <u>Informants and Cooperating Witnesses</u>.  The defendant requests disclosure of the names and

18  addresses of all informants or cooperating witnesses used or to be used in this case, and in particular,

19  disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime

20  charged against Mr. Mojica.  The Government must disclose the informant's identity and location, as well as

21  disclose the existence of any other percipient witness unknown or unknowable to the defense.  <u>Roviaro v.</u>

22  <u>United States</u>, 353 U.S. 53, 61-62 (1957).  The Government must disclose any information derived from

23  informants which exculpates or tends to exculpate the defendant.

24     (21)  <u>Bias by Informants or Cooperating Witnesses</u>.  The defendant requests disclosure of any

25  information indicating bias on the part of any informant or cooperating witness.  <u>Giglio v. United States</u>, 405

26  U.S. 150 (1972).  Such information would include what, if any, inducements, favors, payments or threats were

27  made to the witness to secure cooperation with the authorities.

28  //

1    (22) <u>Government Examination of Law Enforcement Personnel Files</u>. Mr. Mojica requests that the

2    Government examine the personnel files and any other files within its custody, care or control, or which could

3    be obtained by the government, for all testifying witnesses, including testifying officers. Mr. Mojica requests

4    that these files be reviewed by the Government attorney for evidence of perjurious conduct or other like

5    dishonesty, or any other material relevant to impeachment, or any information that is exculpatory, pursuant

6    to its duty under <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991). The obligation to examine files

7    arises by virtue of the defense making a demand for their review: the Ninth Circuit in <u>Henthorn</u> remanded for

8    <u>in camera</u> review of the agents' files because the government failed to examine the files of agents who

9    testified at trial. This Court should therefore order the Government to review all such files for all testifying

10   witnesses and turn over any material relevant to impeachment or that is exculpatory to Mr. Mojica prior to

11   trial. Mr. Mojica specifically requests that the prosecutor, not the law enforcement officers, review the files

12   in this case. The duty to review the files, under <u>Henthorn</u>, should be the prosecutor's. Only the prosecutor

13   has the legal knowledge and ethical obligations to fully comply with this request.

14   (23) <u>Expert Summaries</u>. Defendant requests written summaries of all expert testimony that the

15   government intends to present under Federal Rules of Evidence 702, 703 or 705 during its case in chief,

16   written summaries of the bases for each expert's opinion, and written summaries of the experts' qualifications.

17   Fed. R. Crim. P. 16(a)(1)(E). This request includes, but is not limited to, fingerprint expert testimony.

18   (24) <u>Residual Request</u>. Mr. Mojica intends by this discovery motion to invoke his rights to discovery

19   to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of

20   the United States. This request specifically includes all subsections of Rule 16. Mr. Mojica requests that the

21   Government provide him and his attorney with the above requested material sufficiently in advance of trial

22   to avoid unnecessary delay prior to cross-examination.

23                                          **III.**

24   **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS' INSTRUCTIONS
     AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH**

25   ***NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH AMENDMENT BY
     DEPRIVING MR. MOJICA OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY**

26   **A.      Introduction.**

27   The indictment in the instant case was returned by the January 2007 grand jury. That grand jury was

28   instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007. <u>See</u>

6                                                          07CR2984-BTM

1  Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto

2  as Exhibit A.  Judge Burns' instructions to the impaneled grand jury deviate from the instructions at issue in

3  the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in

4  several ways.[2]  These instructions compounded Judge Burns' erroneous instructions and comments to

5  prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions

6  at Ex. A.  See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto

7  as Exhibit B.[3]

8       **1.    Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine**
        **Whether or Not Probable Cause Exists and That They Have No Right to Decline to**
9       **Indict When the Probable Cause Standard Is Satisfied.**

10          After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

11  responsibility, see Ex. A at 3, 3-4, 5, Judge Burns instructed the grand jurors that they were forbidden "from

12  judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

13  federal law or should not be a federal law designating certain activity [as] criminal is not up to you."  See id.

14  at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that

15  judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even

16  though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may

17  be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

18  because the grand jurors disagree with a proposed prosecution.

19          Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred

20  to an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

21          I've gone over this with a couple of people.  You understood from the questions and answers
             that a couple of people were excused, I think three in this case, because they could not adhere
22           to the principle that I'm about to tell you.

23  _____

24  [2]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas,
     408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v.
25  Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156
     (9th Cir. 2002) (per curiam).

26
27  [3]  The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the
     grand jury.  Mr. Mojica requests that the video presentation be produced.  See United States v. Alter, 482 F.2d
28  1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by
     which the grand jury conducts those proceedings are not.").

07CR2984-BTM

1  Id.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

2  disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors on his

3  view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

4        Examination of the voir dire transcript, which contains additional instructions and commentary in the

5  form of the give and take between Judge Burns and various prospective grand jurors, reveals how Judge

6  Burns' emphasis of the singular duty is to determine whether or not probable cause exists and his statement

7  that grand jurors cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an

8  erroneous series of instructions already given to the grand jury venire.  In one of his earliest substantive

9  remarks, Judge Burns makes clear that the grand jury's sole function is probable cause determination.

10        [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime
          was committed?  And second, do we have a reasonable belief that the person that they propose
11        that we indict committed the crime?"

12        If the answer is "yes" to both of those, then the case should move forward.  If the answer to
          either of the questions is "no," then the grand jury should not hesitate and not indict.
13

14  See Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context which makes clear that

15  the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it

16  addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

17  committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

18  crime."

19        Equally revealing are Judge Burns' interactions with two potential grand jurors who indicated that, in

20  some unknown set of circumstances, they might decline to indict even where there was probable cause.

21  Because of the redactions of the grand jurors' names, Mr. Mojica will refer to them by occupation.  One is a

22  retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA).  The

23  CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not

24  an effective use of resources.  See id. at 16.  The CSW was also troubled by certain unspecified immigration

25  cases.  See id.

26        Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the CSW.

27  He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district,

28  such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.  Rather, he

07CR2984-BTM

1   provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not

2   capable of expression in the context of grand jury service. See id. at 16-17. Thus, without any sort of context

3   whatsoever, Judge Burns let the grand juror know that he would not want him or her to decline to indict in

4   an individual case where the grand juror "[didn't] like what our government is doing," see id. at 17, but in

5   which there was probable cause. See Id. Such a case "should go forward." See id. Any grand juror listening

6   to this exchange could only conclude that there was *no* case in which Judge Burns would permit them to vote

7   "no bill" in the face of a showing of probable cause.

8       Just in case there may have been a grand juror that did not understand his or her inability to exercise

9   anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA. REA

10  first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

11  "medical marijuana." See id. at 24. Judge Burns first sought to address REA's concerns about medical

12  marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

13  considerations into account. Id. at 24-25. Having stated that REA was to "abide" by the instruction given to

14  trial jurors, Judge Burns went on to suggest that REA recuse him or herself from medical marijuana cases.

15  See id. at 25.

16      In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

17  That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

18  juror is obligated to vote to indict if there is probable cause. See id. at 26-27. Thus, the grand juror's duty is

19  to conduct a simple two part test, which, if both questions are answered in the affirmative, lead to an

20  "obligation" to indict.

21      Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

22  paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation

23  to indict in every case in which there was probable cause. See id. at 27. Two aspects of this exchange are

24  crucial. First, REA plainly does not intend to act solely on his political belief in decriminalization -- whether

25  he or she would indict "depend[s] on the case," see id., as it should. Because REA's vote "depend[s] on the

26  case," see id., it is necessarily true that REA would vote to indict in some (perhaps many or even nearly all)

27  cases in which there was probable cause. Again, Judge Burns made no effort to explore REA's views. The

28  message is clear: it does not matter what type of case might prompt REA's reluctance to indict because, once

1  the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."  See id. at 27.

2  That is why even the "chance," see id., that a grand juror might not vote to indict was too great a risk to run.

3      **2.    The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.**

4

5          In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the

6  grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See Ex.

7  A at 20.[4]

8          The antecedent to this instruction is also found in the voir dire.  After advising the grand jurors that

9  "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns

10  gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball.  If there's something

11  adverse or that cuts against the charge, you'll be informed of that.  They have a duty to do that."  See id.  Thus,

12  Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was

13  "adverse" or "that cuts against the charge."  See id.

14  **B.    Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

15

16          The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

17  grand jurors in the Southern District of California.  See Navarro-Vargas II, 408 F.3d 1184.  While the Ninth

18

19  _____

20  [4] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general.  Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you."  See Ex. A at 27; see also Ex. B at 38; id. at 43; id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

24          In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns' instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked."  See Ex. A at 12.  As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors."  Navarro-Vargas, 408 F.3d at 1215.  The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court.  See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

07CR2984-BTM

1    Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

2    approach[5] to the problems posed by the instructions, endorsed many of the substantive arguments raised by

3    the defendants in those cases.  The district court's instructions cannot be reconciled with the role of the grand

4    jury as set forth in Navarro-Vargas II.  Taken together, the voir dire of and instructions given to the January

5    2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a

6    bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to

7    exercise any quasi-prosecutorial discretion.  That is not the institution the Framers envisioned.  See United

8    States v. Williams, 504 U.S. 36, 49 (1992).

9           For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas

10   II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

11   deciding whether a particular prosecution shall be instituted or followed up, performs much the same function

12   as a grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510

13   (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas

14   I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

15   prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that

16   the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but

17   also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the

18   prosecutor." Id.  See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional Function of

19   the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was

20   "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted

21   that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure

22   § 15.2(g) (2d ed. 1999)).

23          Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

24   in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

25          The grand jury thus determines not only whether probable cause exists, but also whether to
            "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps

26

27   [5]See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he
     instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or
28   obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

1  most significant of all, a capital offense or a non-capital offense -- all on the basis of the same facts. And, significantly, the grand jury may refuse to return an indictment even "'where a

2  conviction can be obtained.'"

3  Id. (quoting Vasquez, 474 U.S. at 263). The Supreme Court has itself reaffirmed Vasquez's description of

4  the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls

5  not only the initial decision to indict, but also significant questions such as how many counts to charge and

6  whether to charge a greater or lesser offense, including the important decision whether to charge a capital

7  crime." Id. at 399 (citing Vasquez, 474 U.S. at 263). Judge Hawkins notes that the Navarro-Vargas II

8  majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse

9  to indict someone even when the prosecutor has established probable cause that this individual has committed

10  a crime." See id. at 1214 (Hawkins, J. dissenting). Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J.,

11  dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J.,

12  dissenting). In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit.

13  But not in Judge Burns' instructions.

14  **C.     Judge Burns' Instructions Forbid the Exercise of Grand Jury Discretion Established in Both *Vasquez* and *Navarro-Vargas II*.**

15

16  The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand jury

17  to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision

18  in Marcucci. Marcucci reasoned that the instructions do not mandate that grand jurors indict upon every

19  finding of probable cause because the term "should" may mean "what is probable or expected." 299 F.3d at

20  1164 (citation omitted). That reading of the term "should" makes no sense in context, as Judge Hawkins ably

21  pointed out. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of

22  the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors,

23  and thus to circumscribe the grand jury's constitutional independence."). See also id. ("The 'word' should is

24  used to express a duty [or] obligation.") (quoting The Oxford American Diction and Language Guide 1579

25  (1999) (brackets in original)).

26  The debate about what the word "should" means is irrelevant here; the instructions here make no such

27  fine distinction. The grand jury instructions make it painfully clear that grand jurors simply may not choose

28  not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree

1   with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting

2   even though I think that the evidence is sufficient'. . . ."  See Ex. A at 8-9.  Thus, the instruction flatly bars

3   the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror

4   would read this language as instructing, or even allowing, him or her to assess "the need to indict." Vasquez,

5   474 U.S. at 264.

6       While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether

7   an indictment was required if probable cause existed, see Ex. B at 4, 8, in context, it is clear that he could only

8   mean "should" in the obligatory sense.  For example, when addressing a prospective juror, Judge Burns not

9   only told the jurors that they "should" indict if there is probable cause, he told them that if there is not

10  probable cause, "then the grand jury should hesitate and not indict." See id. at 8.  At least in context, it would

11  strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand

12  jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205.  Clearly he was

13  not.

14      By the same token, if Judge Burns said that "the case should move forward" if there is probable cause,

15  but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see Navarro-

16  Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended two

17  different meanings of the word "should" in the space of two consecutive sentences.  That could not have been

18  his intent. But even if it were, no grand jury could ever have had that understanding.[6]  Jurors are not presumed

19  to be capable of sorting through internally contradictory instructions.  See generally United States v. Lewis,

20  67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot presume that the

21  jury followed the correct one") (citation, internal quotations and brackets omitted).

22      Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

23  clear to the grand jurors that "should" was not merely suggestive, but obligatory:

24      **(1)**      The first occasion occurred in an exchange when Judge Burns conducted voir dire and excused

25  a potential juror (CSW).  See Ex. B at 17.

26  _____

27  [6] This argument does not turn on Mr. Mojica's view that the Navarro-Vargas/Marcucci reading of the word
    "should" in the model instructions is wildly implausible.  Rather, it turns on the context in which the word

28  is employed by Judge Burns in his unique instructions, context which eliminates the Navarro-Vargas/Marcucci
    reading as a possibility.

07CR2984-BTM

1    **(2)**     In an even more explicit example of what "should" meant, Judge Burns makes clear that there
2    is an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.  See
3    id. at 26-27.  After telling this potential juror (REA) what his obligations and prerogatives were, the Court
4    inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there
5    was probable cause they committed a drug offense?" Id. at 27.  The potential juror responded: "It would
6    depend on the case." Id.  Nevertheless, that juror was excused.  Id. at 28.  Again, in this context, and contrary
7    to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative
8    to do anything other than indict if there is probable cause.

9    **(3)**     As if the preceding examples were not enough, Judge Burns continued to pound the point home
10   that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist on is
11   that you follow the law that's given to us by the United States Congress.  We enforce the federal laws here."
12   See id. at 61.

13   **(4)**     And then again, after swearing in all the grand jurors who had already agreed to indict in every
14   case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he reminded
15   them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the
16   evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law
17   ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

18   Moreover, Judge Burns advised the grand jurors that they were forbidden from considering the
19   penalties to which indicted persons may be subject.  See Ex. B at 24-25.  A "business-like decision of whether
20   there was a probable cause" would obviously leave no role for the consideration of penalty information.  See
21   id.

22   The Ninth Circuit previously rejected a claim based upon the proscription against consideration of
23   penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See
24   United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two
25   reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context,
26   as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there
27   ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly authorized
28   consideration of penalty information.  See 474 U.S. at 263.

1  Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time

2  again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

3  was probable cause.  These instructions go far beyond the holding of <u>Navarro-Vargas</u> and stand in direct

4  contradiction of the Supreme Court's decision in <u>Vasquez</u>.  Indeed, it defies credulity to suggest that a grand

5  juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

6  <u>Vasquez</u>:

7        The grand jury does not determine only that probable cause exists to believe that a defendant
         committed a crime, or that it does not.  In the hands of the grand jury lies the power to charge
8        a greater offense or a lesser offense; numerous counts or a single count; and perhaps most
         significant of all, a capital offense or a non-capital offense – all on the basis of the same facts.

9
         Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be
10       obtained."

11  474 U.S. at 263 (quoting <u>United States v. Ciambrone</u>, 601 F.2d 616, 629 (2d Cir. 1979) (Friendly, J.,

12  dissenting)); <u>accord</u> <u>Campbell v. Louisiana</u>, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the

13  initial decision to indict, but also significant decisions such as how many counts to charge and whether to

14  charge a greater or lesser offense, including the important decision whether to charge a capital crime.").  Nor

15  would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." <u>See</u>

16  <u>id.</u> at 264.  Judge Burns's grand jury is not <u>Vasquez</u>'s grand jury.  The instructions therefore represent

17  structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand

18  jury proceeding." <u>See</u> <u>United States v. Isgro</u>, 974 F.2d 1091, 1094 (9th Cir. 1992).  The indictment must

19  therefore be dismissed.  <u>Id.</u>

20      The <u>Navarro-Vargas II</u> majority's faith in the structure of the grand jury *is not* a cure for the

21  instructions excesses.  The <u>Navarro-Vargas II</u> majority attributes "[t]he grand jury's discretion -- its

22  independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions."

23  408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's instructions may have on a grand

24  jury because "it is the *structure* of the grand jury process and its *function* that make it independent." <u>Id.</u> at

25  1202 (emphases in the original).

26      Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the

27  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

28  of many of its decisions -- sufficiently protects that power." <u>See</u> <u>id.</u> at 1214 (Hawkins, J., dissenting).  The

1  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

2  making a probable cause determination . . . unconstitutionally undermines the very structural protections that

3  the majority believes save[] the instruction." <u>Id.</u>  After all, it is an "'almost invariable assumption of the law

4  that jurors follow their instructions.'"  <u>Id.</u> (quoting <u>Richardson v. Marsh</u>, 481 U.S. 200, 206 (1987)).  If that

5  "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

6  in <u>Vasquez</u>.  Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous

7  instructions because nothing will happen if they disobey them." <u>Id.</u>

8         In setting forth Judge Hawkins' views, Mr. Mojica understands that this Court may not adopt them

9  solely because the reasoning that supports them is so much more persuasive than the majority's sophistry.

10 Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

11        Here, again, the question is not an obscure interpretation of the word "should", especially in light of

12 the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the

13 Court in <u>Navarro-Vargas II</u> because they had not yet been disclosed to the defense, but an absolute ban on the

14 right to refuse to indict that directly conflicts with the recognition of that right in <u>Vasquez</u>, <u>Campbell</u>, and both

15 <u>Navarro-Vargas II</u> opinions.  <u>Navarro-Vargas II</u> is distinguishable on that basis, but not only that.

16        Judge Burns did not limit himself to denying the grand jurors the power that <u>Vasquez</u> plainly states

17 they enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment

18 prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle . . . ." <u>See</u>

19 Ex. A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot

20 embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the

21 conscience of the community.  <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand

22 jury exercising its powers under <u>Vasquez</u> "serves ... to protect the accused from the other branches of

23 government by acting as the 'conscience of the community.'") (quoting <u>Gaither v. United States</u>, 413 F.2d

24 1061, 1066 &  n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on

25 their own initiative, rules of grand jury procedure," <u>United States v. Williams</u>, 504 U.S. 36, 50 (1992), and,

26 here, Judge Burns has both fashioned his own rules and enforced them.

27 //

28 //

1   **D.**     **The Instructions Conflict with <u>Williams</u>' Holding That There Is No Duty to Present Exculpatory Evidence to the Grand Jury.**

2

3        In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth Amendment,

4 argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

5 exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

6 common law. <u>See</u> 504 U.S. at 45, 51. <u>Williams</u> held that "as a general matter at least, no such 'supervisory'

7 judicial authority exists." <u>See</u> <u>id.</u> at 47. Indeed, although the supervisory power may provide the authority

8 "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

9 amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

10 Court and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted), it does

11 not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." <u>Id.</u> at 47

12 (emphasis added). The federal courts possess only "very limited" power "to fashion, on their own initiative,

13 rules of grand jury procedure." <u>Id.</u> at 50. As a consequence, <u>Williams</u> rejected the defendant's claim, both

14 as an exercise of supervisory power and as Fifth Amendment common law. <u>See</u> <u>id.</u> at 51-55.

15        Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would

16 present to them evidence that tended to undercut probable cause. <u>See</u> Ex. A at 20. Moreover, the district

17 court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can

18 expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll

19 act in good faith in all matters presented to you." <u>See</u> <u>id.</u> at 27. The Ninth Circuit has already concluded it

20 is likely this final comment is "unnecessary." <u>See</u> <u>Navarro-Vargas</u>, 408 F.3d at 1207.

21        This particular instruction has a devastating effect on the grand jury's protective powers, particularly

22 if it is not true. It begins by emphasizing the message that <u>Navarro-Vargas II</u> somehow concluded was not

23 conveyed by the previous instruction: "You're all about probable cause." <u>See</u> Ex. A at 20. Thus, once again,

24 the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

25 probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely

26 would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they

27 should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

28 will present it. The end result, then, is that grand jurors should consider evidence that goes against probable

1 cause, but, if none is presented by the government, they can presume that there is none. See Ex. B at 14-15

2 ("my experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts

3 against the charge, you'll be informed of that. *They have a duty to do that*.") (emphasis added).

4    These instructions create a presumption that, in cases where the prosecutor does not present

5 exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no

6 exculpatory evidence was presented, would proceed along these lines:

7    (1)    I have to consider evidence that undercuts probable cause.

8    (2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such

9 evidence to me, if it existed.

10    (3)    Because no such evidence was presented to me, I may conclude that there is none.

11 Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence

12 presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound

13 prosecutor would have presented it.

14    The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

15 prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

16 probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

17 of the equation because it was not presented. A grand jury so badly misguided is no grand jury at all under

18 the Fifth Amendment.

19                                                    **IV.**

20                          **MOTION FOR COURT TO ORDER A BILL OF PARTICULARS**

21    Mr. Mojica requests, pursuant to Fed. Crim. P. 7(f), that the Court direct the government to file a bill

22 of particulars concerning this case.

23    The purpose of the bill of particulars is threefold: (1) to provide a defendant with information about

24 the details of the charges necessary to the preparation of a defense; (2) to avoid prejudicial surprise at trial;

25 and, (3) to protect against a second prosecution based upon the same set of facts. United States v. Skalski,

26 1995 WL 7870, *2 (N.D.Cal. 1995)(citing Yeargain v. United States, 314 F.2d 881 (9th Cir. 1963)). The bill

27 requires the government to particularize the matters charged in the indictment, thus elucidating the theory of

28 its prosecution. Yeargain, 314 F.2d at 882.

07CR2984-BTM

1   Indeed, a bill of particulars will be ordered whenever it appears necessary to enable the defendant to

2   meet the charge against him or to avoid danger of injustice.  United States v. Allied Chemical & Dye Corp.,

3   42 F.Supp. 425, 428 (S.D.N.Y. 1941)(citing Coffin v. United States, 156 U.S. 432, 452 (1895)).  This is true

4   even where the indictment states all the ingredients of the offense.  Myers v. United States, 15 F.2d 977, 983

5   (8th Cir. 1926)("The office of a bill of particulars attaches without distinction, where the indictment states

6   all the ingredients of the offense and further detail may be required or demanded for the protection of the

7   defendant").

8   Here, the government alleges a previous deportation, exclusion, and removal, but does not say when

9   it allegedly occurred.  The validity of the deportation, exclusion and removal are essential issues in

10  determining the lawfulness of the charge.  The government must specify its allegations.   The defense also

11  requests that the government disclose the names of all witnesses to Mr. Mojica's alleged crime in the bill of

12  particulars.

13                                                          **V.**

14  **THE COURT MUST SUPPRESS MR. MOJICA'S STATEMENTS UNDER THE FIFTH**
    **AMENDMENT**

15

16  **A.** **Introduction**

17  Mr. Mojica's alleged statements in the field, his first set of statements at the station, and his recorded

18  statements taken over 7 hours after his arrest should be suppressed for failure  to comply with Miranda,

19  violation of the McNabb-Mallory rule, and involuntariness. Mr. Mojica's alleged statements in the field must

20  be suppressed because he was in custody at the time he was questioned and had not been advised of his

21  Miranda rights.  His first set of statements at the border patrol station must also be suppressed for the same

22  reason---he was in custody, but was not advised of his Miranda rights prior to questioning.  Finally, Mr.

23  Mojica's recorded statements over 7 hours later must also be suppressed.  Although the agents read Mr.

24  Mojica his rights prior to the questioning, the rights were insufficient to dissipate the taint of the inconsistent

25  administrative rights that were previously read to him or the fact that his prior statements were elicited without

26  the benefit of Miranda warnings.  In addition to the inadequacy of the warnings themselves, this Court should

27  also suppress the statements based on the time that elapsed prior to the interrogation.

28  //

1 **B.      The Agents Failed to Comply with *Miranda* or the Safe Harbor Rule.**

2 The prosecution may not use statements, whether exculpatory or inculpatory, stemming from a

3 custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to

4 secure the privilege against self-incrimination.  Miranda v. Arizona, 384 U.S. 436, 444 (1966).[7]  Custodial

5 interrogation is questioning initiated by law enforcement officers after a person has been taken into custody

6 or otherwise deprived of his freedom of action in any significant way.  Id.  See Orozco v. Texas, 394 U.S. 324,

7 327 (1969).

8 Once a person is in custody, Miranda warnings must be given prior to any interrogation.  See

9 United States v. Estrada-Lucas, 651 F.2d 1261, 1265 (9th Cir. 1980).  Those warnings must advise the

10 defendant of each of his or her "critical" rights.  United States v. Bland, 908 F.2d 471, 474 (9th Cir. 1990).

11 In order for the warning to be valid, the combination or the wording of its warnings cannot be affirmatively

12 misleading.  United States v. San Juan Cruz, 314 F.3d 384, 387 (9th Cir. 2003).  The warning must be clear

13 and not susceptible to equivocation. Id. (vacating illegal entry conviction where defendant was advised of his

14 administrative rights from an I-826 form and later advised of his Miranda rights).  If a defendant indicates that

15 he wishes to remain silent or requests counsel, the interrogation must cease.  Miranda, 384 U.S. at 474; see

16 also Edwards v. Arizona, 451 U.S. 484 (1981).

17 **1.      Field Statements**

18 Mr. Mojica was in custody at the time of the alleged questioning as he had been deprived of his

19 freedom by the agents.  Mr. Mojica was not provided Miranda warnings prior to this questioning.  Therefore,

20 the Court should suppress any statements made by Mr. Mojica in the field.

21 **2.      First Set of Statements at the Station**

22 Mr. Mojica was in custody at the time of the alleged questioning as he had been deprived of his

23 freedom by the agents.  Mr. Mojica was not provided Miranda warnings prior to this questioning.  Therefore,

24 the Court should suppress any statements made by Mr. Mojica at the station.

25 //

26

27 [7] In Dickerson v. United States, 530 U.S. 428, 120 S. Ct. 2326 (2000), the Supreme Court held that Miranda

28 rights are no longer merely prophylactic, but are of constitutional dimension.  Id. at 2336 ("we conclude that Miranda announced a constitutional rule").

1       **3.    Recorded Statements Taken Over Seven Hours After Arrest**

2           a.    Violation of *United States v. San Juan Cruz.*

3       In United States v. San Juan Cruz, 314 F.3d 384, 387-88 (9th 2002), two different and conflicting

4   sets of warning were read to the defendant.  First, Mr. San Juan was informed of his Administrative Rights

5   pursuant to 8 C.F.R. § 287.3.  Id.  Mr. San Juan was then advised, under Miranda, that if he could not afford

6   an attorney, one would be appointed for him.  Id.  The Ninth Circuit unambiguously held:

7           [T]o be valid, a Miranda warning must convey *clearly* to the arrested party that he or she
            possesses the right to have an attorney present prior to and during questioning.  The
8           warning also must make clear that if the arrested party would like to retain an attorney but
            cannot afford one, the Government is obligated to appoint an attorney for free.
9

10  Id. at 388 (citation omitted, emphasis in original).  The Ninth Circuit determined that the two sets of warnings

11  were confusing because the defendant could not reasonably ascertain from the warnings provided whether he

12  could or could not retain the services of an attorney for free.  Id.  To rectify the situation, the interrogating

13  agent should have clarified his statements or advised San Juan to disregard the Administrative Rights in favor

14  of those read to him under Miranda.  Id. at 389.

15      According to discovery, a third statement was taken from Mr. Mojica after advising him of his rights

16  under Miranda.  This final statement was recorded on a DVD and produced in discovery.  The DVD provided

17  by the government demonstrates that the agents did not clearly tell Mr. Mojica that his administrative rights

18  no longer applied and that he was entitled to an attorney during this round of interrogation.  Because the

19  agents failed to clearly advise Mr. Mojica that his administrative rights no longer applied, his statements must

20  be suppressed.

21          b.    Mr. Mojica's Statements Should Be Suppressed Because the Agents Violated *Missouri
                 v. Seibert.*
22

23      The statements must also be suppressed because, assuming the Miranda warnings were actually

24  given, they were withheld until after Mr. Mojica had already been questioned and confessed.  "The threshold

25  issue when interrogators question first and warn later is thus whether it would be reasonable to find that in

26  these circumstances the warnings could function 'effectively' as Miranda requires."  Missouri v. Seibert, 124

27  S.Ct. 2601, 2610 (2004) (plurality).  "By any objective measure" where interrogators withhold warnings until

28  after interrogation succeeds in eliciting a confession, "the warnings will be ineffective in preparing a suspect

1  for successive interrogation, close in time and similar in content." Id.  Unless the warnings could place a

2  suspect who has just been interrogated in a position to make an informed choice to stop talking even if he had

3  talked earlier, "there is no practical justification for accepting the formal warnings as compliance with

4  Miranda, or for treating the second stage of interrogation as distinct from the first. . ." Id.  Thus, "it would

5  ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as

6  independent interrogations subject to independent evaluation simply because Miranda warnings formally

7  punctuate them in the middle.  Id. at 2611.

8       Here, the agents intentionally questioned Mr. Mojica without the benefit of Miranda warnings,  and

9  after he confessed, provided him with Miranda warnings and recorded his statement.  Because the agents

10  intentionally questioned Mr. Mojica without reading him his Miranda rights, under Seibert, his later

11  statements after Miranda warnings were provided should be suppressed.

12            c.    <u>Mr. Mojica's Statements Should Be Suppressed Because They Were Obtained Outside
              the Safe-Harbor Period and He Was Not Arraigned Without Unnecessary Delay.</u>

13

14       Mr. Mojica's post-arrest statements must be suppressed because they were taken more than 7 hours

15  after his arrest and the government failed to arraign him without unnecessary delay as required under Fed. R.

16  Crim. P. 5(a)(1)(A).

17       Rule 5(a)(1)(A) of the Federal Rules of Criminal Procedure provides that "[a] person making an

18  arrest within the United States must take the defendant without unnecessary delay before a magistrate judge,

19  or before a state or local judicial officer . . . ." Fed. R. Crim. P. 5(a)(1)(A).  The "[p]rovisions related to Rule

20  5(a) contemplate a procedure that allows arresting officers little more leeway than the interval between arrest

21  and the ordinary administrative steps required to bring a suspect before the nearest magistrate." Mallory v.

22  United States, 354 U.S. 449, 453 (1957).  The police must "arraign the arrested person before a judicial officer

23  as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be

24  promptly determined." Id. at 454.  The arrested person may be booked, "[b]ut he is not to be taken to police

25  headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to eliciting

26  damaging statements to support the arrest and ultimately his guilt." Id.

27       "If a United States magistrate is not reasonably available under Rule 5(a), the arrested person shall

28  be brought before a state or local judicial officer . . . and such officer shall inform the person of the rights

1    specified in rule 5(c) and shall authorize the release of the arrested person . . ." Fed. R. Crim. P. 5, Advisory

2    Committee Notes, 1972 Amendment.  The language of this provision "reflects the view that time is of the

3    essence."  See Fed. R. Crim. P. 5, Advisory Committee Notes, 2002 Amendments.

4           "Legislation such as this requiring that the police must with reasonable promptness show legal cause

5    for detaining arrested persons, constitutes an important safeguard -- not only in assuring protection for the

6    innocent but also in securing conviction of the guilty by methods that commend themselves to a progressive

7    and self-confident society." Mallory, 354 U.S. at 452 (quoting McNabb v. United States, 318 U.S. 332, 342-44

8    (1943)).  In order to adequately enforce the requirement of prompt arraignment, it is necessary to render

9    inadmissible incriminating statements elicited from defendants during a period of unlawful detention.  Id. at

10   453.

11          In Mallory, for example, the Supreme Court found that "the circumstances of [the] case preclude a

12   holding that arraignment was without unnecessary delay."  Id. at 455.  There, the defendant was arrested in

13   the early afternoon, interrogated for approximately a half-hour, detained for an additional four hours, and

14   interrogated again.  Id.  The defendant was not arraigned until the next morning.  Id. at 451.  In finding the

15   statements inadmissible due to the unnecessary delay in arraignment, the Supreme Court emphasized that "[i]t

16   is not the function of the police to arrest, as it were, at large and to use an interrogating process at police

17   headquarters in order to determine whom they should charge before a committing magistrate . . . ."  Id. at 456.

18          According to reports provided in discovery, Mr. Mojica was detained on October 2, 2007 around

19   8:00 a.m.  However, he was not interrogated by the agents until approximately 3:23 p.m.  Finally, the

20   government waited until October 4, 2007 to arraign Mr. Mojica.  As such, he was not taken "without

21   unnecessary delay before a magistrate judge, or before a state or local judicial officer . . . ." as required by

22   Rule 5.  Therefore, Mr. Mojica's statements must be suppressed.

23          Pursuant to 18 U.S.C. § 3501(c), delay in presentment, beyond six hours, requires suppression of any

24   incriminating statements made thereafter.  See 18 U.S.C. § 3501(c).  "The clear meaning of this provision is

25   that delay alone *permits* suppression when any of these requisites are *not* met."  United States v. Perez, 733

26   F.2d 1026, 1031 (2d Cir. 1984) (emphasis in original).  Thus, the Ninth Circuit has held that "there must be

27   circumstances in which delay in arraignment will require suppression of a confession regardless of the

28   voluntariness of the confession."  United States v. Alvarez-Sanchez, 975 F.2d 1396, 1401 (9th Cir. 1992),

1 overruled on other grounds, 511 U.S. 350 (1994) (holding that the exclusionary rule—due to delay in

2 arraignment—does not apply where the person is detained solely on state charges). See also Perez, 733 F.2d

3 at 1031 ("[§] 3501 leaves the *McNabb-Mallory* rule intact with regard to confessions obtained after a six hour

4 delay"); United States v. Robinson, 439 F.2d 553, 563-64 (same).

5       Because Mr. Mojica was not questioned within the 6 hour safe harbor or promptly arraigned before

6 a magistrate judge or other state or local official, his statements must be suppressed.

7             d.    The Court Should Suppress Mr. Mojica's Recorded Statements as Involuntary.

8       Even when the procedural safeguards of Miranda have been satisfied, a defendant in a criminal case

9 is deprived of due process of law if his conviction is founded upon an involuntary confession. Arizona v.

10 Fulminante, 499 U.S. 279 (1991); Jackson v. Denno, 378 U.S. 368, 387 (1964). The government bears the

11 burden of proving that a confession is voluntary. Lego v. Twomey, 404 U.S. 477, 483 (1972).

12       In order to be voluntary, a statement must be the product of a rational intellect and free will.

13 Blackburn v. Alabama, 361 U.S. 199, 208 (1960). In determining whether a defendant's will was overborne

14 in a particular case, this Court must consider the totality of the circumstances. Schneckloth at 226; see also

15 United States v. Bautista-Avila, 6 F.3d 1360, 1364 (9th Cir. 1993). A statement is involuntary if it is

16 "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight,

17 [or] by the exertion of any improper influence." Hutto v. Ross, 429 U.S. 28, 30 (1976) (quoting Bram v.

18 United States, 168 U.S. 532, 542-43 (1897)); see also United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir.

19 1981).

20       To meet its burden, the government must demonstrate that Mr. Mojica's statement was ***not*** the result

21 of either threats or promises made by the agents, but was made voluntarily.

22       Moreover, delay in interrogating a defendant "can provide the sole basis for a finding of

23 involuntariness, if the delay exceeds six hours." United States v. Manuel, 706 F.2d 908, 913 (9th Cir. 1983).

24 See also United States v. Perez, 733 F.2d 1026, 1031 (2d Cir. 1984) ("delay alone *permits* suppression")

25 (emphasis in original).  In United States v. Wilson, the Ninth Circuit stated that "the fact that unreasonable

26 delay, alone, beyond six hours may support a finding of involuntariness suggests that unreasonable delay is

27 the most important factor of all [in the 3501 analysis]." 838 F.2d 1081, 1085 (9th Cir. 1988). Wilson further

28 explains "if unreasonable delay in excess of six hours can itself form the basis for a finding of involuntariness,

1  that same delay may also suggest involuntariness of the <u>Miranda</u> waiver." <u>Id.</u> at 1086.  Finally, in <u>Alvarez-</u>

2  <u>Sanchez</u>, 975 F.2d at 1400-01, the Ninth Circuit noted that while delay prior to obtaining a confession may

3  be a basis for finding statements to be involuntary, pre-confession delay (as opposed to pre-arraignment delay)

4  need not be unreasonable to warrant suppression.  Because Mr. Mojica's statements were obtained over seven

5  hours after his detention, this Court should find that his <u>Miranda</u> waiver and subsequent statements were

6  involuntary, and thus, inadmissible.

7  **C.**     **<u>This Court Must Conduct An Evidentiary Hearing</u>**

8        Accordingly, this Court must conduct an evidentiary hearing to determine whether the government

9  can meet this burden and use Mr. Mojica's statements against him.  18 U.S.C. § 3501.  Since "'suppression

10  hearings are often as important as the trial itself,'" these findings should be supported by evidence, not merely

11  an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading.  <u>See</u> <u>United States</u>

12  <u>v. Prieto-Villa</u>, 910 F.2d 601, 609-610 (9th Cir. 1990) (quoting <u>Waller v. Georgia</u>, 467 U.S. 39, 46 (1984)).

13        Mr. Mojica's statements were made as a result of the coercive tactics employed by the agents.  Unless

14  and until the government demonstrates that these statements were made voluntarily, the statements may <u>not</u>

15  be used <u>for any purpose</u> at trial.

16                                                **VI.**

17                         **<u>REQUEST FOR LEAVE TO FILE FURTHER MOTIONS</u>**

18        Mr. Mojica and defense counsel have not received all the discovery in this case.  As new information

19  comes to light, the defense may find it necessary to file further motions.  Therefore, defense counsel requests

20  the opportunity to file further motions based upon information gained from any further discovery.

21                                                **VII.**

22                                         **<u>CONCLUSION</u>**

23        For the reasons stated above, Mr. Mojica respectfully requests that this Court grant the foregoing

24  motions.

25                                    Respectfully submitted,

26                                    /s/ *Robert R. Henssler, Jr.*

27  Dated: November 30, 2007          **ROBERT R. HENSSLER JR.**
                                      Federal Defenders of San Diego, Inc.
28                                    Attorneys for Mr. Mojica-Peralta